UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

DANIEL SKAFF,

                              Plaintiff,

                v.

PROGRESS INTERNATIONAL, LLC,

                        Defendant.

------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: October 28, 2014

12 Civ. 9045 (KPF)

OPINION AND ORDER

KATHERINE POLK FAILLA, District Judge:

      This Court entered a default judgment for breach of contract against Defendant on March 7, 2013, and issued an Opinion and Order adopting the Report and Recommendation of United States Magistrate Judge Frank Maas as to damages on March 4, 2014. Both orders contemplated the appointment of a receiver.

      The instant dispute concerns primarily the scope of that receiver's authority. Plaintiff Daniel Skaff ("Skaff" or "Plaintiff"), acting on behalf of the former shareholders of Vivaro Corporation ("Vivaro"), initially asked the Court to grant the receiver authority to take full control of Defendant Progress International, LLC ("Progress" or "Defendant"), effect its sale or liquidation, and apply the proceeds of the sale to satisfy the judgment. Defendant, filing for the first time in this action, objected that under the contracts at issue the receiver should have authority only over Defendant's deposit accounts. Plaintiff responded that, even if this were the case, the receiver's authority should be

broader in several respects than that contemplated by Defendant's proposed order.

Both parties are correct in parts. Defendant is correct that the agreements between the parties accord relatively little authority to the receiver. Plaintiff is correct that the Court's equitable power to enforce a default judgment justifies granting the receiver substantially broader authority. Yet this Court is not inclined to assume the role of a bankruptcy court and replicate the process of sorting out competing claims through the receivership process. Accordingly, the Court authorizes the receiver to take possession of Defendant and all its assets and conduct a thorough accounting, but not to liquidate or distribute such assets — except for those explicitly identified by the agreements — absent further Court order.

## BACKGROUND[1]

### A.    The Prior Litigation History

The facts leading up to the Court's previous opinion in this case are more fully set forth in the R&R and in *Skaff I*, but the relevant details will be briefly recapped. In June 2010, Plaintiff, Vivaro, Defendant, and a subsidiary of Defendant entered into an Agreement and Plan of Merger dated June 18, 2010 (the "Merger Agreement"), under which the subsidiary merged into Vivaro, which then became a wholly-owned subsidiary of Defendant. *Skaff I*, 2014 WL

---

[1]    The facts contained herein are based upon Judge Maas's Report and Recommendation of October 21, 2013 (Dkt. #29) (the "R&R"); the Court's previous Opinion and Order of March 4, 2014, adopting the R&R, *Skaff* v. *Progress Int'l, LLC*, No. 12 Civ. 9045 (KPF), 2014 WL 856521 (S.D.N.Y. Mar. 4, 2014) ("*Skaff I*"); and the Amended Complaint (Dkt. #2) ("Compl.") and the exhibits attached thereto, including the Merger Agreement ("MA") and the Security Agreement ("SA").

856521, at *1.  The Merger Agreement was amended through multiple addenda, and the parties subsequently entered into a Security Agreement dated October 12, 2010 (the "Security Agreement").  (Compl. Ex. A, B).

Under the terms of the Merger Agreement, Progress was to make a series of payments totaling over $4 million to Skaff and the other shareholders. (R&R 2-3).  Progress failed to make all but a single payment of $50,000.  (*Id.* at 4).  On December 12, 2012, Plaintiff filed suit alleging breach of contract and requesting compensatory relief and specific performance.  *Skaff I*, 2014 WL 856521, at *2.  On January 14, 2013, Plaintiff requested that the Clerk of Court enter default against Defendant, and on January 30, 2013, the Clerk of Court did so.  *Id.*  Plaintiff moved for entry of default judgment on February 19, 2013, and the Court granted the motion on March 4, 2013.  *Id.*  On March 4, 2014, the Court adopted the recommendation of Judge Maas as to damages, and entered judgment for Plaintiff against Defendant for $4,005,000.00 in compensatory damages; prejudgment interest on each defaulted installment payment comprising that sum calculated at the rate of 5.75% per annum from the installment due date; postjudgment interest on that sum from March 7, 2013, at the rate set forth in 28 U.S.C. § 1961(a); and $53,976.64 in attorney's fees and expenses.  *Id.* at *5.

## B.   The Instant Litigation

In the same Opinion and Order, the Court also announced its intention to appoint a receiver, and ordered Plaintiff to identify a qualified receiver and the scope of the receiver's appointment.  *Skaff I*, 2014 WL 856521, at *6.

Plaintiff did so on April 3, 2014, recommending the appointment of Jeffrey A. Compton as receiver.  (Dkt. #34).  Plaintiff submitted a proposed order granting broad powers to the receiver, including the authority to "[t]ake over immediate custody, possession, and control of the Judgment Debtor and collect, preserve, and liquidate all of its assets and income…." (*Id.*).  By letter dated April 9, 2014, Plaintiff identified § 6.08 of the Merger Agreement as the source of his right to "all of [Defendant's] assets," and § 6(b) of the Security Agreement as the source of his right to "the appointment of a receiver or keeper to take possession of Collateral and to enforce any of [Plaintiff's] remedies."  (Dkt. #37).

On April 10, 2014, Defendant responded, objecting to Plaintiff's proposed order.  (Dkt. #36).  Defendant argued that because a receiver was sought and granted only pursuant to the contract, rather than to enforce the default judgment under Fed. R. Civ. P. 66, the scope of the receiver's authority must be limited, pursuant to Security Agreement § 6(b), to taking possession of the Collateral identified in the Security Agreement, *viz.*, Defendant's bank accounts.  (Dkt. #36).  Defendant attached an alternative proposed order, empowering the receiver only to take possession of the bank accounts identified as Collateral by Security Agreement § 1(c).  (*Id.* at Ex. A).

On April 28, 2014, Plaintiff submitted an amended response to Defendant's objections.  (Dkt. #41).  Plaintiff first argued that Defendant was, de facto, improperly trying to set aside a final judgment, as Plaintiff had been granted a default judgment while requesting specific performance of all of Defendant's obligations under the Merger and Security Agreements.  (*Id.*).

4

Second, Plaintiff argued that the Security Agreement did not supplant the grant of collateral provided in the Merger Agreement, as the clause in the Security Agreement that purported to do so was merely a recital clause without binding effect.  (*Id.*).  Third, Plaintiff argued that appointment of a receiver with broad powers was appropriate in any case to enforce the default judgment under New York law.  (*Id.*).  Finally, Plaintiff argued that if the Court were inclined to limit the receiver's authority to that set out in the Security Agreement, it should include two other powers specified in that agreement, namely, the power of attorney found in Exhibit A and the power to "cause Progress to honor the money-funneling obligations imposed by the covenants" found in § 4.  (Dkt. #41).  Plaintiff submitted a revised proposed order that would so establish the receiver's authority.  (*Id.* at Ex. A).

On May 30, 2014, the Court held a conference with the parties to discuss the proper scope of the receiver's authority.  Pursuant to the Court's direction, Plaintiff submitted on June 6, 2014, an additional memorandum of law in support of its motion for appointment of a receiver under Fed. R. Civ. P. 66 and N.Y. C.P.L.R. 5228(a).  (Dkt. #48).  Defendant responded in opposition on June 13, 2014.  (Dkt. #52).  Notably, Defendant acknowledged that "Progress has accumulated more than $30 million in debt" and "effectively ceased operation in or around March 2013," and has had no income or revenues since shortly thereafter.  (*Id.*).  Defendant, however, argued and provided affidavits to demonstrate that its primary asset, a 49 percent stake in the Mexican telecommunications company Marcatel S.A. de C.V., was subject to a superior

security interest held by Marcatel itself, granted in 2012 to secure a debt

exceeding $31 million.  (*Id.*).

**C.      The Terms of the Merger Agreement and the Security Agreement**

Several provisions of the Merger Agreement are implicated by the parties'

arguments and thus are set forth here.  Of particular significance to Plaintiff's

current application, § 6.08 provided, in relevant part:

> § 6.08 ("Security Documents"): [Defendant] hereby
> grants to [Plaintiff] … a first priority lien and security
> interest in and to all of its assets, including but not
> limited to its accounts receivable and cash and cash
> equivalents.  [Defendant] and [Plaintiff] shall enter into
> a security agreement, and execute such other
> documents and take such further actions as [Plaintiff]
> shall determine are necessary or appropriate to perfect
> such lien and security interest….

(MA § 6.08).  Further on, § 8.04 made clear that the Merger Agreement "may

not be amended except by an instrument in writing signed by the parties

hereto" (MA § 8.04), and § 10.07 made clear that the Merger Agreement "shall

be governed by, and construed in accordance with, the laws of the State of

Delaware" (*id.* at § 10.07).  Finally, the Merger Agreement contained a specific

performance clause, pursuant to which

> [t]he parties hereto agree[d] that irreparable damage
> would occur in the event any provision of this
> Agreement was not performed in accordance with the
> terms hereof and that the parties shall be entitled to
> specific performance of the terms hereof in addition to
> any other remedy at law or in equity.

(MA § 10.06).

The Security Agreement, by contrast, contained the following provision

among its recital paragraphs:

6

> WHEREAS, that notwithstanding the fact that in order to induce the Company to enter into the Merger Agreement, [Defendant] agreed to grant a first priority lien and security interest in and to all of its assets, including but not limited to its accounts receivable and cash and cash equivalents, [Plaintiff] has agreed with [Defendant] to substitute such lien and instead perfect a lien and security interest granting a continuing first priority Security Interest in (as hereinafter defined), and Lien (as hereinafter defined) on, the Collateral (as hereinafter defined) to secure all of the Secured Obligations (as hereinafter defined).

(SA preamble).

Section 1(b) of the Security Agreement defined "Collateral" to have "the meaning ascribed thereto in Section 2(a) hereof" (SA § 1(b)); that section, in turn, provided:

> To secure the prompt and complete payment, performance and observance of all of the Secured Obligations, the [Defendant] hereby grants, assigns, conveys, mortgages, pledges, hypothecates and transfers to [Plaintiff], for itself and the benefit of the Stockholders, a first priority continuing Security Interest and Lien upon all of its right, title and interest in, to and under all Deposit Accounts, including all deposit and other bank accounts and all deposits therein, whether now owned by or owing to, or hereafter acquired by or arising in favor of the [Defendant] (including under any trade names, styles or derivations thereof), and whether owned or consigned by or to, the [Defendant], and regardless of where located (all of which being hereinafter collectively referred to as the 'Collateral').

(SA § 2(a)).  Section 1(c) defined "Deposit Accounts" to include "all 'deposit accounts,' as such term is defined in the Code, now or hereafter held in the name of the [Defendant], including but not limited to all deposit accounts listed on Schedule I hereto."  (*Id.* at § 1(c)).

7

Section 6 of the Security Agreement outlined Plaintiff's remedies in the event of default.  Section 6(a) stated that

> In addition to all other rights and remedies authorized or granted to it under this Security Agreement, the Merger Agreement and under any other instrument or agreement securing, evidencing or relating to any of the Secured Obligations, if any Event of Default shall have occurred and be continuing, [Plaintiff] may exercise all rights and remedies of a secured party under the Code....

(SA § 6(a)).  In addition, § 6(b) permitted Plaintiff, "if [he] so elects, [to] seek the appointment of a receiver or keeper to take possession of Collateral and to enforce any of [Plaintiff's] remedies (for the benefit of [Plaintiff] and the Stockholders)...."  (*Id.* at § 6(b)).

## DISCUSSION

As set forth more fully below, this Court agrees with Plaintiff that the Security Agreement does not supplant the security interest provided for in the Merger Agreement.  However, Defendant is correct that only the Security Agreement, and not the Merger Agreement, provides for appointment of a receiver to take possession of the collateral identified therein.  Looking beyond the Agreements, appointment of a receiver under Fed. R. Civ. P. 66 is appropriate to enforce the default judgment based upon Defendant's self-professed effective insolvency.  The Court is not, however, inclined to order hastily a liquidation and distribution involving multiple claimants that is more suited to the bankruptcy process.

A. **The Agreements Only Allow the Receiver to Take Possession of the Deposit Accounts**

1. **The Security Agreement Does Not Supplant the Merger Agreement**

The text of the Security Agreement's preamble seemingly substitutes the security interest granted by the Merger Agreement for that granted by the Security Agreement:

> WHEREAS, that notwithstanding the fact that in order to induce the Company to enter into the Merger Agreement, [Defendant] agreed to grant a first priority lien and security interest in and to all of its assets, including but not limited to its accounts receivable and cash and cash equivalents, [Plaintiff] has agreed with [Defendant] to substitute such lien and instead perfect a lien and security interest...."

(SA preamble (the "Substitution Clause")). However, "although a statement in a 'whereas' clause may be useful in interpreting an ambiguous operative clause in a contract, it cannot create any right beyond those arising from the operative terms of the document." *Aramony* v. *United Way of Am.*, 254 F.3d 403, 413 (2d Cir. 2001) (quoting *Abraham Zion Corp.* v. *Lebow,* 761 F.2d 93, 103 (2d Cir. 1985)) (internal quotation marks omitted). Such clauses "convey background factors that inform the parties' agreement but do not create obligations between them." *United States* v. *Hamdi*, 432 F.3d 115, 125 (2d Cir. 2005). In practice, courts have invoked this principle to reject arguments that a "whereas" clause in a contract modified rights external to the contract. *See, e.g., Choquette* v. *City of New York*, 839 F. Supp. 2d 692, 702 (S.D.N.Y. 2012).

The Substitution Clause qualifies as such a "whereas" clause. In assessing the import of such a clause, the Second Circuit has closely

scrutinized both the grammatical construction of a sentence and its location within the contract to determine whether it is operative. *See Hamdi*, 432 F.3d at 124 ("The language that the government suggests constitutes an operative waiver of appellate rights is similarly difficult to read as a promise by Hamdi. Unlike the explicit promissory sentences quoted above, it is purely declarative: 'The defendant's sentence *is* governed by the United States Sentencing Guidelines.' The sentence introduces the plea agreement's second paragraph, the rest of which sets forth the government's estimate of the likely adjusted offense level based on the facts known to it at the time."). The Tenth Circuit has also examined this issue by analyzing federal and state cases applying this principle of New York contract law. In so doing, the Tenth Circuit has focused on the language of the clause rather than its location. *See In re Universal Serv. Fund Tel. Billing Practice Litig.*, 619 F.3d 1188, 1204-06 (10th Cir. 2010) ("A reasonable promisee would certainly read the phrase, 'The AT & T Universal Connectivity Charge is a monthly charge to Customers to recover amounts AT & T must pay into the [Universal Service Fund, or "USF"]' as a promise that AT & T would charge a [Universal Connectivity Charge, or "UCC") in the amount it must pay into the USF and no more. Accordingly, the phrase constitutes a valid promise under New York law," *id.* at 1206; "None of the authorities cited by AT & T support invalidating this promise simply because it is located in a 'description' section of an expressly incorporated service guide," *id.* at 1205).

Applying these principles to the Security Agreement, neither the location nor the grammatical construction of the Substitution Clause supports its

interpretation as an operative clause.  It is located in a "WHEREAS" clause, which appears in the recital portion of the contract.  It is not until the following paragraph that the words "the parties hereto agree as follows" appear, and it is only after *that* clause that the parties' substantive rights and obligations are laid out.  Furthermore, the Substitution Clause reads: "[Plaintiff] *has agreed* with [Defendant] to substitute …."  (SA Substitution Clause (emphasis added)).  Grammatically, this language speaks to a prior agreement, separate from the Security Agreement in which it appears.

Even if the clause is not operative, it could still be used as an interpretive guide to the purpose of § 2(a) of the Security Agreement, which, as noted, defined the scope of the collateral over which Plaintiff has a security interest and lien.  Yet this is not a case where § 2(a) is ambiguous, and some external guide is needed.  Nor is there a risk of rendering § 2(a) superfluous: § 2(a) and § 6(b), read together, offer an enforcement mechanism that is both narrower and deeper than that offered by the Merger Agreement (on which more below).

It is true that, looking at the Merger Agreement and the Security Agreement in conjunction, it appears to be the intent of the parties that the Security Agreement concretize the security arrangement set forth in the Merger Agreement.  And, indeed, the Merger Agreement explicitly provides for such a forthcoming agreement: "[Defendant] and [Plaintiff] shall enter into a security agreement, and execute such other documents and take such further actions as [Plaintiff] shall determine are necessary or appropriate to perfect such lien and security interest as soon as practicable…."  (MA § 6.08).  Yet § 6.08 of the

11

Merger Agreement does not appear to contemplate that future agreements would *reduce* the scope of Plaintiff's collateral, but rather merely perfect that which was already granted.  Accordingly, Plaintiff is entitled to the contractual remedies provided for in *both* the Merger Agreement and the Security Agreement.

### 2. Only the Security Agreement Provides a Contractual Basis for the Appointment of a Receiver

#### a. The Security Agreement

##### i. The Receiver May Take Possession of the Collateral Identified in the Security Agreement

The parties do not dispute that the Security Agreement provides for appointment of a receiver pursuant to § 6(b).  Under § 6(b), Plaintiff is entitled to appointment of a receiver to "to take possession of Collateral and to enforce any of [Plaintiff's] remedies."  As a preliminary matter, the Court finds that these two clauses indicate a single power of the receiver, rather than two distinct powers.  Reading § 6(b) as a unified whole, it seems clearly to contemplate that the receiver's powers are limited to taking possession of the collateral and disposing of it for the benefit of Plaintiff.  *See Kass* v. *Kass*, 91 N.Y.2d 554, 566 (1998) ("Particular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby." (quoting *Atwater & Co.* v. *Panama R.R. Co.*, 246 N.Y. 519, 524 (1927))).  Additionally, because taking possession of collateral and applying it to a deficiency *is* a remedy under the UCC, *see* N.Y. U.C.C. Law § 9-610(a), reading § 6(b) as granting a free-floating

remedy to enforce Plaintiff's remedies would render "to take possession of collateral" superfluous. *See Law Debenture Trust Co. of N.Y.* v. *Maverick Tube*, 595 F.3d 459, 468 (2d Cir. 2010) ("The court should read the integrated contract as a whole to ensure that undue emphasis is not placed upon particular words and phrases, and to safeguard against adopting an interpretation that would render any individual provision superfluous." (internal quotation marks and citations omitted)). Thus § 6(b) of the Security Agreement allows Plaintiff to have a receiver appointed to take possession of the Collateral identified in § 2(a), and to apply that collateral towards enforcing Plaintiff's remedies (such as specific performance).

The Collateral provided for in the Security Agreement encompasses "all Deposit Accounts, including all deposit and other bank accounts and all deposits therein, whether now owned by or owing to, or hereafter acquired by or arising in favor of [Defendant] (including under any trade names, styles or derivations thereof), and whether owned or consigned by or to, [Defendant], and regardless of where located." (SA § 2(a)). Comparing Defendant's proposed order and Plaintiff's revised proposed order, the parties do not appear to dispute the scope of this grant. (*Compare* Dkt. #38 Ex. A, *with* Dkt. #41 Ex. A).

### ii. The Security Agreement Does Not Grant the Receiver Power of Attorney

Plaintiff additionally contends that the receiver's powers, if limited to those granted by the Security Agreement, "should be co-extensive with all of the enforcement rights granted to Plaintiff, including the power of attorney found at Exhibit A to the Security Agreement and the power to cause Progress

to honor the money-funneling obligations imposed by the covenants found in Section 4 of the Security Agreement." (Dkt. #41).  Plaintiff, however, offers no argument for the conflation of the powers of the receiver, which are textually confined to those laid out in SA § 6(b), with those of Plaintiff, which are the subject of virtually the entire remaining portion of the Security Agreement.[2]

While Plaintiff is not entitled to transfer his full complement of powers under the Security Agreement to the receiver, even Progress seems to recognize that some powers broader than those explicitly granted in § 6(b) are necessary to effectuate the receiver's ability to acquire and distribute the Collateral. Specifically, Defendant's proposed order would direct all Progress officers to furnish the receiver with any information necessary to the execution of his responsibilities (Dkt. #38 Ex. A), though such an obligation is only imposed upon Defendant by § 4(g) of the Security Agreement, which requires Defendant to furnish such information to Plaintiff.  The power of attorney laid out in Exhibit A, however, primarily concerns Plaintiff's ability to stand in Defendant's shoes in prosecuting claims against third parties, rather than assert any rights directly against Defendant.  Plaintiff's request to grant the receiver power of attorney is therefore denied.

---

[2]    With respect to the "money-funneling obligations," neither Plaintiff nor the receiver is granted any inherent powers under the Security Agreement to enforce such obligations. That does not, however, alter Defendant's legal obligation not to "[u]se other accounts other than the Deposit Accounts for receiving cash amounts derived from its business operations or modify any agreement for the purpose of diverting any of its proceeds from its business operations to any account other than the Deposit Accounts." (SA § 4(h)(ii)).

### b. The Merger Agreement Does Not Provide Any Basis for Expanding the Scope of the Receiver's Authority

As indicated above, the Merger Agreement remains fully in force despite the "whereas" clause of the Security Agreement. Thus, Plaintiff maintains the security interest granted in Section 6.08.[3] However, neither the Merger Agreement nor Delaware law appears to contemplate a receiver who would take control of property in which a secured party has a security interest. The Court recognizes that Delaware's UCC § 9-609 empowers a secured party to take possession of any collateral after default, and that § 9-102 defines "collateral" as "the property subject to a security interest." Plaintiff is therefore entitled to take possession of the property in which it has a valid security interest under Delaware law. Plaintiff and the receiver may thus have a Venn diagram of overlapping rights to take possession of property identified as part of the security interest in the Merger Agreement and/or part of the Collateral identified in the Security Agreement. While such an arrangement is less than ideal, it is the one provided for by the parties' agreements.

### B. Appointment of a Receiver to Enforce the Default Judgment Under Fed. R. Civ. P. 66 Is Warranted

Under New York law,[4] when a party seeks to enforce a default judgment based upon breach of contract, "New York will apply the law of the enforcing

---

[3]   Importantly, the existence of a security interest does not foreclose a greater recovery for breach of contract where the security interest is designed to secure repayment rather than satisfy a preexisting debt. *See, e.g., ImagePoint, Inc.* v. *JPMorgan Chase Bank, N.A.*, No. 12 Civ. 7183 (LAK) (GWG), 2014 WL 2884080, at *6 (S.D.N.Y. June 25, 2014) (report and recommendation), *objections to report and recommendation overruled*, 2014 WL 3891326 (S.D.N.Y. Aug. 8, 2014).

[4]   A federal court sitting in diversity jurisdiction applies the choice of law analysis of the state in which it sits. *Klaxon Co.* v. *Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).

jurisdiction," rather than that of the contract's jurisdiction.  *Competex, S.A.* v. *Labow*, 783 F.2d 333, 341 (2d Cir. 1986).  This rule follows from the principle that New York "gives to the place having the most interest in the problem paramount control over the legal issues arising out of a particular factual context," *Intercontinental Planning, Ltd.* v. *Daystrom, Inc.*, 24 N.Y.2d 372, 382 (1969) (internal quotation marks omitted), and the Supreme Court's recognition that enforcement measures are of greater interest to the enforcing state than to the state in which the obligation originated, *cf. Baker by Thomas* v. *Gen. Motors Corp.*, 522 U.S. 222, 235 (1998).  Furthermore, under Fed. R. Civ. P. 66, "the practice in administering an estate by a receiver or a similar court-appointed officer must accord with the historical practice in federal courts or with a local rule."

In New York, courts are empowered "[u]pon motion of judgment creditor … [to] appoint a receiver who may be authorized to administer, collect, improve, lease, repair or sell any real or personal property in which the judgment debtor has an interest or to do any other acts designed to satisfy the judgment."  N.Y. C.P.L.R. 5228(a).  "In exercising that discretion, however, New York courts have considered such factors as: [i] alternative remedies available to the creditor; [ii] the degree to which receivership will increase the likelihood of satisfaction; and [iii] the risk of fraud or insolvency if a receiver is not appointed."  *United States* v. *Zitron*, No. 80 Civ. 6535 (RLC), 1990 WL 13278, at *1 (S.D.N.Y. Feb. 2, 1990); *see also Hotel 71 Mezz Lender LLC* v. *Falor*, 14 N.Y.3d 303, 317 (2010).

Plaintiff does have alternative remedies here, not least of which is the appointment of a receiver under the Security Agreement.  Plaintiff also has yet to make an unsuccessful demand for the money owed under the default judgment, in contrast to most cases in which a receiver is appointed.  *See, e.g.*, *Spotnana, Inc.* v. *Am. Talent Agency, Inc.*, No. 09 Civ. 3698 (LAP), 2013 WL 227546, at *6 (S.D.N.Y. Jan. 22, 2013) (appointing a receiver where the defendant had flouted its obligations under a settlement and judgment); *Zitron*, 1990 WL 13278, at *1 (appointing receiver where "all other attempts at enforcement of the judgment [had] proved futile," and where the defendants "neither challenge[d] the government's assertion that it [had] no other recourse for enforcing the judgment nor offer[ed] a viable alternative to ensure its satisfaction"); *Sealy* v. *Sealy*, 57 A.D.2d 893, 893 (2d Dep't 1977).  Yet Defendant has effectively acknowledged that seizure of the Deposit Accounts and further demand for payment will be largely futile; its primary defense to appointment of a broadly empowered receiver under Fed. R. Civ. P. 66 is that Plaintiff will *still* be unable to obtain satisfaction of the judgment.  (*See* Dkt. #52).  Under these unusual circumstances, the Court is left to conclude that Plaintiff lacks alternative remedies that are likely to be effective.

Turning to the second factor — the degree to which appointment of a receiver will increase the likelihood of recovery — Defendant takes a too-literal view of the appropriate standard.  Defendant's position is that Plaintiff will not recover the full amount regardless; because zero percent is no greater than zero percent, appointment of a receiver thus will not increase the likelihood of full

recovery.  (*See* Dkt. #52).  Yet appointment of a receiver is a discretionary measure that should be governed by common sense.  Here, appointment of a broadly empowered receiver appears likely to increase the size of the recovery relative to appointment of a receiver with control over the Deposit Accounts alone, even if not to 100 percent.  Under such circumstances, appointment of a receiver may be appropriate.

Considering the third factor — the risk of fraud or insolvency if a receiver is not appointed — Defendant focuses exclusively on the risk of fraud.  Such myopia is understandable.  While the Court agrees that Plaintiff has little more than unsubstantiated allegations to suggest a risk that Defendant has committed or will commit fraud, Defendant has admitted that it has "effectively ceased operations," and "has had no income or revenues" in over one year. (Dkt. #52).  Such significant risk of insolvency can justify appointment of a receiver without any indication of fraud.  *See Hotel 71*, 14 N.Y.3d at 317-18; *see also Zitron*, 1990 WL 13278, at *2 ("Perhaps the strongest factor militating toward receivership is the corporations' uncertain economic future.").

The factors identified as relevant to appointment of a receiver in New York thus militate in favor of appointment.  The Court recognizes that "[a] motion to appoint a receiver should only be "granted ... when a special reason appears to justify one," *Hotel 71*, 14 N.Y.3d at 317 (internal quotation marks and citation omitted), and that caution is warranted before appointing a receiver to take possession of a company, especially if that company is neither

a sole proprietorship nor closely-held,[5] *see Zitron*, 1990 WL 13278, at *2.  Yet concern about disrupting a corporation's affairs through appointment of a receiver carry far less weight where the corporation is not merely moribund but effectively deceased.  Accordingly, the Court will grant the receiver broader authority under Fed. R. Civ. P. 66 than he would receive from the Agreements alone.

**C.     The Receiver Should Not Liquidate Plaintiff or Distribute Assets that Are Not Explicitly Allocated by the Security Agreement**

Plaintiff urges the Court to appoint a receiver to effect the liquidation of Defendant, and both parties urge the Court to decide here and now the fate of certain assets of Defendant in receivership, most notably Defendant's 49 percent stake in Marcatel, a Mexican telecommunications company with which Defendant had a significant relationship prior to its effective demise.  (*See* Dkt. #48; Dkt. #52).  It is true that "[t]he district court has broad powers and wide discretion to determine relief in an equity receivership."  *S.E.C.* v. *Elliott*, 953 F.2d 1560, 1566 (11th Cir. 1992).  And this Circuit has recognized that there are circumstances in which liquidation through receivership can be appropriate, such as to expedite the liquidation of a company found to operate as a Ponzi scheme so as to better compensate its victims.  *See S.E.C.* v. *Credit Bancorp, Ltd.*, 290 F.3d 80, 89-90 (2d Cir. 2002); *S.E.C.* v. *Byers*, 637 F. Supp. 2d 166, 174-75 (S.D.N.Y. 2009), *aff'd sub nom. S.E.C.* v. *Orgel*, 407 F. App'x

---

[5]     The Court is not aware of Progress's full ownership structure, but simply that it is a limited liability corporation.

504 (2d Cir. 2010) (summary order), and *aff'd sub nom. S.E.C.* v. *Malek*, 397 F.
App'x 711 (2d Cir. 2010) (summary order).

Yet the Second Circuit "has consistently expressed a preference against
the liquidation of defendant corporations through the mechanism of …
receiverships, as opposed to through the bankruptcy courts." *Malek*, 397 F.
App'x at 714.  "[B]ecause receivership should not be used as an alternative to
bankruptcy, [the Second Circuit has] disapproved of district courts using
receivership as a means to process claim forms and set priorities among
various classes of creditors." *Eberhard* v. *Marcu*, 530 F.3d 122, 132 (2d Cir.
2008).  This Court is disinclined to "take[] upon itself the burden of processing
proof-of-claim forms filed by … noteholders and other creditors, of setting
priorities among classes of creditors, and of administering sales of real
property, all without the aid of either the experience of a bankruptcy judge or
the guidance of the bankruptcy code." *S.E.C.* v. *Am. Bd. of Trade, Inc.*, 830
F.2d 431, 438 (2d Cir. 1987).

Accordingly, this Court is mindful of the Second Circuit's caution that
receivership "should not be continued, in a case involving insolvency, beyond
the point necessary to get the estate into the proper forum for liquidation — the
bankruptcy court." *Lankenau* v. *Coggeshall & Hicks*, 350 F.2d 61, 63 (2d Cir.
1965).  The receiver should take control of Defendant and its assets in order to
preserve them, and conduct an accounting so that Plaintiff and any other
claimants can assess the state of the company and identify any assets in which
they may have a security interest.  Neither liquidation (except where necessary

20

to preserve value) nor disposition of assets (except for the Deposit Accounts) is appropriate at this time, however.

## CONCLUSION

For the reasons set forth above, the Court orders as follows:

1.  THE COURT HEREBY APPOINTS Jeffrey A. Compton of Houston, Texas, as Receiver pursuant to § 6(b) of the Security Agreement and Fed. R. Civ. P. 66.  As Receiver, Mr. Compton shall immediately be empowered to take any and all of the following actions:

    a.  Take over immediate custody, possession, and control of the Judgment Debtor Progress International, LLC.

    b.  Collect any of the Company's accounts, both in form of cash and amounts due to the Company;

    c.  Obtain control of bank accounts, leases, security deposits, and keys necessary to collect the company's assets, including the hiring of a locksmith to change any locks to the Judgment Debtor's business location(s), if any;

    d.  Take reasonable actions necessary to preserve the value of the Company;

    e.  Using reasonable diligence, and to the extent necessary or appropriate, identify and notify the customers of the Judgment Debtor that the business will not continue and that other arrangement must be made by the customers;

    f.  Initiate and prosecute routine legal actions, such as collection, eviction, or forcible entry and detainer actions that are necessary for the prudent operation of the Company.  Mr. Compton is expressly authorized to send a copy of this Order to any tenants, employees, vendors, or others doing business with the Company.

2. IT IS FURTHER ORDERED THAT, specifically with regard to the Judgment Debtor's Deposit Accounts, Mr. Compton shall immediately be empowered to take any and all of the following actions:

    a.  Take possession of Progress's Deposit Accounts as defined in § 1(c) of the Security Agreement (and, accordingly, by UCC § 9-102(a)(29)), including Progress's demand, time, savings, passbook, or similar accounts maintained with a bank, whether now owned by or owing to, or hereafter acquired by or arising in favor of the Judgment Debtor (including under any trade names, styles, or derivations thereof) (the "Collateral").  Deposit Accounts do not include investment property or accounts evidenced by an instrument.  All such Collateral shall be deposited by the Receiver in a segregated account to be established for the purposes of collecting the sums due under the Judgment (the "Segregated Judgment Account"); and

    b.  Apply the net proceeds of any such collection, recovery, receipt, appropriation, realization, or sale of the Collateral as follows:

        i.  First, to satisfy the Receiver's fees and expenses, as detailed below;

ii. Second, to Plaintiff to reimburse him for any payments of the Receiver's costs and expenses; and

iii. Third, following satisfaction of costs and reasonable and necessary expenses of the Receiver, any and all net proceeds to Skaff to the extent necessary to satisfy the judgment.

c. This Order shall NOT be construed to give Mr. Compton the authority, absent subsequent Court authorization, to make any distribution of assets outside of the Collateral specifically identified.  The Collateral specifically does not include Defendant's Marcatel securities.

3. IT IS FURTHER ORDERED that the Receiver shall, within 90 days of qualification, file in this action an inventory of all Company assets that he has been able to identify and/or take possession of.  If Receiver subsequently identifies and/or takes possession of additional property, he shall file a supplemental inventory as soon as practical.

4. IT IS FURTHER ORDERED that Plaintiff shall defend and indemnify Receiver from claims made by Progress or other third parties arising from any cause except the Receiver's gross negligence or willful misconduct.

5. IT IS FURTHER ORDERED that money coming into the possession of the Receiver and not expended for any of the purposes authorized herein shall be held by the Receiver subject to such orders as this Court may hereafter issue.

6.     IT IS FURTHER ORDERED that no senior lien, claim, or other security interest in any property affected by the receivership shall in any manner be affected by this Order.

7.     IT IS FURTHER ORDERED THAT any and all officers, agents, and employees of Progress are required and directed to provide the Receiver with all information necessary to take possession of Progress's Deposit Accounts, including but not limited to (i) a list of all those who owe money to Progress and all documents that pertain to the terms of such debts, and (ii) the location and custodian of all bank accounts maintained for the purpose of operating the Company, or holding income collected therefrom.

8.     IT IS FURTHER ORDERED THAT Mr. Compton is expressly authorized to send a copy of this Order to any tenants, employees, vendors, or others doing business with the Company to the extent necessary to perform the duties prescribed herein.

9.     Mr. Compton's assent to his appointment as receiver shall be shown by the filing of a sworn oath to faithfully implement the terms of this Order. No undertaking or bond shall be required.

10.    Mr. Compton's compensation as Receiver shall be limited to $400 per hour for his services, with an average of no more than $275 per hour for the assistance of other employees of Compton & Wendler, P.C.  Mr. Compton's statement of fees and expenses shall be filed with the Court

and paid by Plaintiff, though Plaintiff is not precluded from then later

seeking to recover those amounts from Progress.

11.    Mr. Compton shall file a monthly report with this Court, which

summarizes his activities as Receiver, including an accounting of all

receipts and expenditures.

12.    This Order shall remain in effect until the Judgment is satisfied, or until

it is vacated or modified by further order of this Court.

   SO ORDERED.

Dated: October 28, 2014
       New York, New York

_____
   KATHERINE POLK FAILLA
   United States District Judge